AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)  ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Central District of California

LODGED
CLERK, U.S. DISTRICT COURT
4/14/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: ___eva___ DEPUTY

FILED
Apr 14, 2021
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION AT SANTA ANA
BY _Nancy Boehme_
Deputy Clerk, U.S. District Court

United States of America,

    Plaintiff

v.

Andrew Lopez,

    Defendant

Case No.  8:21-mj-00258-DUTY

**(UNDER SEAL)**

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about the date(s) of February 9th, 2021 in the county of Orange County in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(C) | Distribution of Fentanyl |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Steven N. Levin
*Complainant's signature*

Steven N. Levin, Special Agent, DEA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: April 14, 2021

**DOUGLAS F. McCORMICK**
*Judge's signature*

City and state: Santa Ana, California

Hon. Douglas F. McCormick, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, Steven N. Levin, being duly sworn, declare and state as follows:

## I.  INTRODUCTION

1.   I am a Special Agent ("SA") with the Drug Enforcement Administration ("DEA"), and have been so employed since March 2020. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). I am empowered to conduct investigations of, and to make arrests for, federal felony offenses enumerated in 18 U.S.C. § 2516.

2.   I am currently assigned to the Los Angeles Field Division, Orange County District Office, in Santa Ana, California, and my responsibilities include investigating large-scale drug trafficking organizations operating in the Southern California area and elsewhere. During the course of my employment, I have received approximately 300 hours of specialized training at the DEA Academy in Quantico, Virginia, on drug identification, detection, and interdiction, money laundering techniques, conspiracy investigations, and asset identification, seizure, and forfeiture.

3.   I have participated in investigations that involve one or all of the following crimes: possession, distribution, possession with intent to distribute, and manufacture of controlled substances. I have executed numerous search warrants to seize evidence of violations of federal and state law, as well as arrest warrants to apprehend individuals who have committed such violations. Additionally, I have led and participated in

numerous investigations and operations to detect and combat the importation, trafficking, distribution, and sales of drugs.

## II. **PURPOSE OF AFFIDAVIT**

4. This affidavit is made in support of a criminal complaint against, and arrest warrant for, Andrew LOPEZ ("LOPEZ") for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C): Distribution of Fentanyl. This affidavit is also made in support of a search warrant for the residence located at 3707 Bell Avenue, Bell, California 90201 (the "SUBJECT PREMISES"), described in Attachment A-1, and the 2007 silver Jeep Cherokee with California license plate number 6YQK919 (the "SUBJECT VEHICLE"), described in Attachment A-2, for the items to be seized described in Attachment B.

5. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III. **PREMISES AND PROPERTY TO BE SEARCHED**

6. The premises and property to be searched are the SUBJECT PREMISES described in Attachment A-1 and the SUBJECT VEHICLE described in Attachment A-2, which Attachments are incorporated herein by reference.

### IV. ITEMS TO BE SEIZED

7. The items to be seized are the evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(C): Distribution of Fentanyl (the "Subject Offense"), as described in Attachment B, which is incorporated herein by reference.

### V. SUMMARY OF PROBABLE CAUSE

8. On or about February 9, 2021, as well as on other dates, LOPEZ sold pills containing suspected fentanyl, a Schedule II controlled substance, to undercover ("UC") law enforcement officials in controlled buys coordinated by the Costa Mesa Police Department ("CMPD") and/or the Drug Enforcement Administration ("DEA"). A DEA chemical lab analysis of the pills obtained at the February 9, 2021 controlled buy confirmed that the pills contained fentanyl.

9. The UC officers and agents saw LOPEZ entering the SUBJECT VEHICLE during or shortly after the controlled buys on February 9, 2021 and other dates. The CMPD conducted a Department of Motor Vehicles ("DMV") records check of the SUBJECT VEHICLE, which identified the SUBJECT PREMISES as LOPEZ's residence. Prior to the controlled buy on March 9, 2021, DEA agents surveilled the SUBJECT PREMISES and saw LOPEZ leave the SUBJECT PREMISES and enter the SUBJECT VEHICLE to travel to the location of the controlled buy.

### VI. STATEMENT OF PROBABLE CAUSE

10. I have reviewed the police reports prepared by CMPD Detectives Ronald Stocking and Vijay Chawla. Based on my review

3

of the reports and conversations with Det. Stocking and Det. Chawla, as well as my own participation and observations throughout the investigation, I have learned the following facts:

11. On or around January 6, 2021, Detective Jaime Santibanez of the CMPD located an advertisement on OfferUP.com, an online marketplace. The title of that advertisement was "Roxy blue shorts – Medium Model 30" and the user was listed as "Dr. Azul." The description of the advertisement read as follows: "Used (normal wear). Adults only. The best you'll find. Long lasting & consistent. Delivery available. Discount for pickups. TEXT anytime: 1(seven1four) 3sixZeroFor2eight1". Based on their training and experience, as well as the title and content of the advertisement, CMPD investigators suspected that the seller from the advertisement was selling real or counterfeit oxycodone pills.

12. On January 6, 2021, Det. Stocking texted the number listed above (1-717-360-4281), posing as a narcotics buyer, and arranged to purchase a sample of five pills from the dealer. At this time, Det. Stocking asked the dealer if the pills were prescription oxycodone or "pressed" (based on my training and experience, and knowledge of this investigation, "pressed" is a term for counterfeit oxycodone pills usually containing fentanyl). The dealer responded that the pills were "Better than the RX… the best." The dealer agreed to meet Det. Stocking at the parking lot of the IKEA store located at 1475 South Coast Drive in Costa Mesa, California. At approximately 4:51 p.m., Det. Stocking arrived at the location and texted the dealer his

4

vehicle description. At approximately 5:07 p.m., the dealer communicated to Det. Stocking that he was in the lot but unable to find Det. Stocking's vehicle and asked that Det. Stocking turn on his hazard lights to identify himself. Several minutes later, a Hispanic male wearing a tan sweater and blue jeans walked in the direction of Det. Stocking's vehicle, stopped, and walked back in the direction of the Returns entrance of the store. At approximately 5:16 p.m., the dealer texted Det. Stocking to drive by the entrance and that he was parked in that area. After Det. Stocking made a couple passes by the entrance, the dealer texted Det. Stocking and advised that he was near the Returns entrance. Det. Stocking concluded, based on his training and experience, that the dealer was conducting counter surveillance.

13. At approximately 5:23 p.m., the dealer waived Det. Stocking down in front of the Returns entrance to the store. Det. Stocking parked in a parking space and a Hispanic male entered the front passenger seat of Det. Stocking's vehicle and introduced himself as "David." Det. Stocking later identified the individual as Andrew LOPEZ based on his vehicle registration and DMV photograph. Det. Stocking asked LOPEZ if he could see the pills. LOPEZ retrieved a small bundle of five blue pills marked "M" on one side and "30" on the other and handed the pills to Det. Stocking in exchange for $150 cash. After the exchange, LOPEZ exited Det. Stocking's vehicle and CMPD Detective Eric Fricke observed LOPEZ enter the driver's seat of a silver Jeep Cherokee, California license plate 6YQK919 (i.e., the SUBJECT

VEHICLE). Based on a close examination of the pills, Det. Stocking believed the pills to be pressed oxycodone.

    14. On January 15, 2021, CMPD Detective Vijay Chawla found an advertisement on OfferUp.com posted by a user named "Dr. Blue Eyes 30" (later confirmed by Det. Chawla to be LOPEZ). The title of the advertisement read, "Roxy Blue shorts Medium Model 30." The description of the advertisement read, "Roxy blue shorts Medium size 30. Top quality condition. Perfect original branded logos, texture, and long lasting durability. Message anytime." The description was accompanied by a photograph of light blue "Roxy" brand shorts. The price listed on the advertisement was $20.

    15. Det. Chawla messaged LOPEZ via the OfferUp.com platform and began conversing with him regarding a purchase of pills. LOPEZ provided Det. Chawla with the telephone number 657-347-2174. After that point, Det. Chawla communicated with LOPEZ via text message at that telephone number.

    16. On January 21, 2021, Det. Chawla texted LOPEZ and arranged to purchase 10 pills from him for $200. LOPEZ asked Det. Chawla to meet him at 20631 Beach Boulevard in Huntington Beach, California.

    17. At approximately 4:40 p.m., Det. Chawla arrived at the parking lot at 20631 Beach Boulevard and texted LOPEZ the description of his vehicle.

    18. At approximately 5:02 p.m., LOPEZ approached Det. Chawla's vehicle wearing a dark baseball cap, a dark colored face mask, and a burgundy sweatshirt. Det. Chawla recognized LOPEZ

from LOPEZ's DMV photograph.  LOPEZ opened the door of Det. Chawla's vehicle and placed a small bundle of blue pills wrapped in plastic on the front passenger seat.  Det. Chawla then placed the $200 cash on the front passenger seat and LOPEZ retrieved the money.  LOPEZ identified himself as "Miguel" to Det. Chawla and told him to save his phone number.  LOPEZ then left the area on foot and was observed by CMPD Sergeant J. Brown and Det. Fricke entering the SUBJECT VEHICLE.

19.  On January 26, 2021, Det. Chawla texted LOPEZ and arranged to purchase five pills for $130.  Det. Chawla and LOPEZ agreed to meet at the Goat Hill Tavern located at 1830 Newport Boulevard in Costa Mesa, California.

20.  At approximately 10:00 p.m., Det. Chawla and Det. Santibanez, both acting in a UC capacity, walked to the alley behind the Goat Hill Tavern.  Det. Chawla texted LOPEZ that he had arrived.

21.  At approximately 10:05 p.m., LOEPZ approached Det. Chawla and Det. Santibanez on foot.  LOPEZ handed Det. Chawla a small bundle of five pills, and Det. Chawla handed LOPEZ $130 in cash.  Det. Chawla inquired if he would be able to get a discount on future transactions.  LOPEZ responded that he would be able to provide a discount if Det. Chawla were to buy pills in quantities of 100 pills or more at a time.  LOPEZ then left the area on foot.  Det. Chawla and Det. Santibanez observed LOPEZ open the front passenger door of a newer model black Dodge Durango and sit in the passenger seat.  Det. Chawla and Det. Santibanez were unable to identify the driver of the vehicle.

7

22. On February 9, 2021, at approximately 12:00 p.m., Det. Chawla, acting in a UC capacity, texted LOPEZ for the purpose of setting up a meeting to buy 135 pills of pressed oxycodone. LOPEZ and Chawla agreed to meet at 1:30 p.m. at 7901 Edinger Avenue in Huntington Beach, California.

23. On February 9, 2021, at approximately 1:15 p.m., Det. Chawla and I, both acting in a UC capacity, parked in the parking lot located at 7561 Center Avenue in Huntington Beach, California. During this time, Det. Chawla maintained communication with LOPEZ via text message. LOPEZ communicated that he would meet Chawla in the parking lot of the Costco located at 7562 Center Avenue in Huntington Beach, California.

24. At approximately 1:55 p.m., Det. Chawla and I each turned on our respective recording devices and parked in a parking spot facing west in the parking lot on the north side of the Costco.

25. At approximately 2:05 p.m., DEA SA Jason Lup communicated that he had located LOPEZ. Around the same time, I moved from the front passenger seat of the UC vehicle to the rear driver's side seat behind Det. Chawla, leaving the front passenger door open.

26. At approximately 2:13 p.m., LOPEZ approached the driver's window of the UC vehicle and initiated dialogue with Det. Chawla. Det. Chawla then introduced me. After a brief conversation, both Det. Chawla and I exited the vehicle and walked around the vehicle to the passenger side and continued speaking with LOPEZ. LOPEZ asked if he could see the money. I

briefly showed the money but did not hand it to LOPEZ.  LOPEZ then asked if he could speak privately with Det. Chawla.  Det. Chawla and LOPEZ then walked approximately 20 feet away and spoke briefly.  Det. Chawla later revealed that LOPEZ inquired about who I was, and that Det. Chawla had responded that he knew me from "Sober Living" and that we were splitting the cost for the pills.  Det. Chawla and LOPEZ then rejoined me near the vehicle.  LOPEZ informed Det. Chawla and me that he did not have the pills on him but asked if we could drive him over to his car to retrieve the pills.

27.  At approximately 2:17 p.m., Det. Chawla entered the driver's seat of the UC vehicle, LOPEZ entered the front passenger seat, and I entered the rear driver's side seat.  As we drove to the parking lot of the Whole Foods, located at 7881 Edinger Avenue in Huntington Beach, California, LOPEZ asked if he could count the money.  I then counted the money in the view of LOPEZ but retained control of the money.  A few minutes later, we arrived in the parking lot on the east side of the Whole Foods and parked facing south.  LOPEZ then indicated that he would obtain the pills from his car and left the vehicle.  LOPEZ walked north to his car, the SUBJECT VEHICLE, opened the driver's side door, briefly ducked inside the vehicle, reemerged from the vehicle and closed the door, and walked back to the UC vehicle.  At this time, LOPEZ reentered the UC vehicle and handed a small plastic wrapped bundle of blue pills, each marked "M" on one side and "30" on the other, to Det. Chawla as I handed LOPEZ $2,000 in cash.

9

28. At this time, Det. Chawla asked LOPEZ about what kind of discount he could get on future purchases. LOPEZ responded that if Det. Chawla were to buy 200 pills in a single deal, LOPEZ would charge $12.50 per pill rather than $15 per pill. LOPEZ then said he would be in contact with Det. Chawla via text about any future deals. LOPEZ then exited the UC vehicle and walked back toward the SUBJECT VEHICLE. LOPEZ did not enter the SUBJECT VEHICLE but instead turned and walked westbound.

29. At approximately 2:25 p.m., Det. Chawla and I drove away in the UC vehicle and left the area.

30. On March 9, 2021, at approximately 10:00 a.m., based on GPS location information from a tracker that was placed on the SUBJECT VEHICLE pursuant to a search warrant issued by the Superior Court of California, County of Orange, DEA agents established surveillance at 3707 Bell Avenue in Bell, California (i.e., the SUBJECT PREMISES). CMPD officers had previously run a DMV records check on the SUBJECT VEHICLE, which identified the SUBJECT PREMISES as LOPEZ's residence.

31. On March 9, 2021, at approximately 10:30 a.m., DEA SA Patrick McMahon signed $2,500 Official Advanced Funds ("OAF") United States Currency ("USC") over to Det. Chawla for the purpose of conducting an undercover buy of approximately 180 counterfeit oxycodone pills from LOPEZ.

32. Throughout the day, Det. Chawla, acting in a UC capacity, communicated via text with LOPEZ. Det. Chawla arranged to meet LOPEZ at Westminster Mall, located at 2008 Westminster Mall in Westminster, California.

33. At approximately 12:50 p.m., DEA SA Yolanda Galvez observed LOPEZ, whom she recognized from his California DMV photograph, wearing a grey hooded sweatshirt and blue jeans, exit the front door of the SUBJECT PREMISES and travel directly to the SUBJECT VEHICLE. Agents maintained surveillance on the SUBJECT VEHICLE through visual observation and tracker data until LOPEZ arrived at the Westminster Mall where he had arranged to meet with Det. Chawla to sell 180 oxycodone pills for $2,500.

34. At approximately 1:30 p.m., Det. Chawla met with LOPEZ in the parking lot of the Target store at Westminster Mall. During this meeting, Det. Chawla exchanged the $2,500 OAF USC for a bindle containing approximately 180 pills of suspected pressed oxycodone and conversed about potential future deals. At approximately 1:35 p.m., Det. Chawla communicated that LOPEZ had left Chawla's vehicle and that the deal was good. Det. Chawla then left the scene and headed back to the CMPD.

35. All drug evidence seized on February 9, 2021, and March 9, 2021, was sent to the DEA Southwest Laboratory. A DEA chemical lab analysis confirmed that the pills seized on February 9, 2021 consisted of approximately 14.7 grams of a mixture containing fentanyl.

### VII. TRAINING AND EXPERIENCE ON THE SUBJECT OFFENSE

36. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-

level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

   b. Drug traffickers commonly possess items associated with the packaging and sales of controlled substances, including commercial plastic wrap, plastic bags or zip lock bags, film canisters, scales, or other weighing devices. The aforementioned items are often maintained where the drug trafficker has ready access to them, such as in their residence and vehicles.

   c. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as in their residence and vehicles and on their cell phones and other digital devices.

   d. Drug traffickers employ tactics and methods to avoid detection by law enforcement, including using: multiple wireless telephones, pre-paid cellular telephones, cloned communication devices, debit calling cards, public pay telephones, counter-surveillance techniques, false or fictitious identities, coded and ambiguous language in conversations, multiple vehicles, and vehicles with concealed compartments.

The tools or instrumentalities of the aforementioned tactics are often maintained where the drug trafficker has ready access to them, such as in their residence and vehicles.

   e. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

   f. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

### VIII. **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

  37. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

13

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

14

who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.  Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    38.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

        a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

        b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

39. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

    a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

    b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

    c. The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that

16

appears to have a biometric sensor and falls within the scope of the warrant: (1) depress LOPEZ's thumb- and/or fingers on the device(s); and (2) hold the device in front of LOPEZ's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

40. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IX.  CONCLUSION

41. For all the reasons described above, there is probable cause to believe that LOPEZ violated 21 U.S.C. §§ 841(a)(1), (b)(1)(C): Distribution of Fentanyl.

42. Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offense will be found at the SUBJECT PREMISES, as described in Attachment A-1, and in the SUBJECT VEHICLE, as described in Attachment A-2.

Attested to by the applicant in
accordance with the requirements
of Federal Rule of Criminal
Procedure 4.1 by telephone on this
<u>14th</u> day of April, 2021.

**DOUGLAS F. McCORMICK**
HONORABLE DOUGLAS F. MCCORMICK
UNITED STATES MAGISTRATE JUDGE